**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BENITO ACOSTA,
*Plaintiff-Appellant*,

v.

CITY OF COSTA MESA; ALLAN
MANSOOR, Mayor of the City of
Costa Mesa, in his official and
individual capacities,
*Defendants-Appellees*,

JOHN HENSLEY, Chief of Police,
Costa Mesa Police Department;
DAVID ANDERSEN; DAVID DEHUFF;
JOHN DOEZIE; BRYAN GLASS;
DANIEL GUTH; DAVID MAKIYAMA;
JEFF TOBIN; DEREK TRUSK; in their
official and individual capacities,
*Defendants*.

No. 10-56854

D.C. No.
8:06-cv-00233-
DOC-MLG

OPINION

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted
July 9, 2012—Pasadena, California

Filed May 3, 2013

Before: Richard C. Tallman and N. Randy Smith, Circuit Judges, and Dee V. Benson, District Judge.[*]

Per Curiam Opinion

## SUMMARY[**]

### Civil Rights

The panel reversed in part and affirmed in part the district court's judgment entered following a jury verdict in this action challenging Costa Mesa Municipal Code § 2-61, which makes it a misdemeanor for members of the public who speak at City Council meetings to engage in "disorderly, insolent, or disruptive behavior."

Reversing the district court, the panel held that the statute was facially invalid because it failed to limit proscribed activity to only actual disturbances. Rather, the statute unnecessarily swept a substantial amount of non-disruptive, protected speech within its prohibiting language. The panel further determined that because neither the term "insolent" in subsection (a), nor the terms "personal, impertinent, profane, insolent" in subsection (b)(1) could be severed from § 2-61, the entire section needed to be invalidated.

[*] The Honorable Dee V. Benson, District Judge for the U.S. District Court for the District of Utah, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel nevertheless held that § 2-61 was constitutionally applied to plaintiff because the jury implicitly found that his behavior actually disrupted the Council meeting. The panel further found that officers did not employ excessive force when enacting plaintiff's seizure and arrest and used only the force reasonably necessary to remove plaintiff from the meeting. The panel also held that plaintiff failed to show prejudice by the admission of his prior statement into evidence and that the district court did not err by rejecting plaintiff's proposed jury instruction.

## COUNSEL

Belinda E. Helzer (argued), ACLU Foundation of Southern California, Orange, California; Hector O. Villagra and Peter J. Eliasberg, ACLU Foundation of Southern California, Los Angeles, California, for Plaintiff-Appellant.

M. Lois Boback (argued) and Daniel K. Spradlin, Woodruff, Spradlin & Smart, APC, Costa Mesa, California, for Defendants-Appellees.

## OPINION

PER CURIAM:

Costa Mesa Municipal Code § 2-61 makes it a misdemeanor for members of the public who speak at City Council meetings to engage in "disorderly, insolent, or disruptive behavior." Benito Acosta ("Acosta") was removed from the Costa Mesa City Council meeting for an alleged violation of the ordinance. Acosta appeals the district court's

dismissal of his First Amendment facial challenge to the ordinance. He also appeals the district court's grant of partial summary judgment in favor of the California city and various individual police officers on his state-law free speech claims and his Fourth Amendment claims. A jury returned a defense verdict on all remaining issues submitted for trial. He also appeals the district court's discretionary decisions to admit certain evidence, refusal to give his proposed limiting instruction, denial of his renewed motion as a matter of law after the jury returned its verdict, and the denial of declaratory relief. He claims that the ordinance is facially invalid and that it was enforced against him only because he expressed a view contrary to the Mayor's.

Because § 2-61 fails to limit proscribed activity to only actual disturbances, we reverse the district court's constitutionality ruling and find the statute facially invalid. Moreover, since the unconstitutional portions of the ordinance cannot be severed from the remainder of the section, we invalidate the entire section. Nevertheless, § 2-61 was constitutionally applied to Acosta, because the jury implicitly found that his behavior actually disrupted the Council meeting. Accordingly, we affirm the remainder of the district court's determinations.

# I

Petitioner-Appellant Benito Acosta is a U.S. citizen of Mexican descent who resides in Orange County, California. Acosta is a founding member of the Colectivo Tonantizin, an organization that represents the rights of undocumented and immigrant workers and their families. Defendants are the City of Costa Mesa ("City"), Mayor Allan Mansoor (the

"Mayor"), Chief of Police John Hensley, and several individual police officers.[1]

The Costa Mesa City Council meets on the first and third Tuesday of every month, with a public portion commencing at 6:00 p.m. The Mayor is the presiding officer who chairs the meeting. In compliance with California law, members of the public may address the City Council concerning any item listed on the meeting agenda at the time designated for public comment.[2] Speakers are each afforded three minutes to speak.

The City ordinances establish rules regulating council meetings. *See* Costa Mesa Mun. Code §§ 2-37–2-87. At issue here is § 2-61, which governs individual conduct at council meetings. A violation of § 2-61 may be prosecuted as a misdemeanor. Meetings are recorded by video cameras and the relevant recordings are part of the record on appeal.

---

[1] The officers pertinent to the appeal are Lieutenant David Andersen, Sergeant Bryan Glass, and Officers David DeHuff, and Daniel Guth, the officers who physically ejected Acosta from the meeting after Chief Hensley directed Acosta's removal when he failed to cease his disruptive activities as requested by the Mayor.

[2] "The Ralph M. Brown Act, [California Government Code § 54950 *et seq.*], is designed to encourage public participation in government." *Coal. of Labor, Agric. & Bus. v. City of Santa Barbara Bd. of Supervisors*, 28 Cal. Rptr. 3d 198, 199 (Ct. App. 2005). Section 54954.3(a) governs the circumstances under which the public must be allowed to address a local legislative body. It provides in part: "Every agenda for regular meetings shall provide an opportunity for members of the public to directly address the legislative body on any item of interest to the public, before or during the legislative body's consideration of the item, that is within the subject matter jurisdiction of the legislative body . . . ."

In December 2005 the Mayor proposed that the City enter into an agreement with Immigration and Customs Enforcement ("ICE") to have its police officers designated immigration agents with the authority to enforce federal immigration laws in the City. The proposal was placed on the City Council's December 6, 2005, agenda and passed by a vote of three to two. Members of the public were permitted to comment on the ICE agreement.

Acosta believed an agreement with ICE would undermine public safety, arguing it would deter undocumented workers from reporting crimes against them for fear of deportation. He attended the December 6 council meeting to express his opposition to the proposal. When Acosta's time came to speak, the video recordings show that he was visibly emotional and agitated.[3] Toward the end of his comments he called the Mayor a "racist pig," at which point the Mayor told Acosta to stop. Acosta repeated his slur, which prompted the Mayor to cut Acosta's speaking time short by calling for a recess. Acosta then responded by calling the Mayor a "fucking racist pig." The Council nonetheless passed the proposal.

---

[3] Acosta submitted a DVD that shows Acosta's remarks at the December 6, 2005, meeting. Three DVDs of the January 3, 2006, meeting were introduced into evidence. Acosta submitted one DVD that shows the relevant portions of proposal supporter Jim Gilchrist's speech and Acosta's speech in opposition. It also includes local news footage taken once Acosta was removed from the chambers. Acosta also submitted a DVD of footage taken by an immigration watch dog group. This DVD depicts the meeting from a different angle that includes more footage of the audience. Appellees submitted a DVD that shows the entire hour of the council meeting up to Acosta's removal and includes the Mayor's opening warning to all participants that they could be removed for causing a disturbance.

After receiving local and national media attention, the City Council again placed the ICE agreement on the agenda of the next regular Council meeting on January 3, 2006. Prior to that meeting, groups supporting and opposing the agreement demonstrated outside City Hall. Council Chambers was filled to overflow capacity and additional demonstrators remained outside. During the public comment portion of the meeting a total of twenty-five speakers addressed the City Council, fifteen in favor of the agreement and ten against.

Jim Gilchrist, co-founder of the Minuteman Project, was one of the first speakers in favor of the ICE agreement. At the beginning of his time he turned to the audience and stated that he would like for the supporters of his position to stand silently at the end of his speech. Some members of the audience began to stand. The Mayor interrupted to clarify whether Gilchrist was asking for people to stand to show that he would be the only speaker representing this group.[4] Gilchrist turned back to the Mayor and agreed that he was representing the views of the entire group. The Mayor then stated that it would be helpful if the other groups could also send up one representative; he added that everyone was entitled to speak if they wished, however.

Acosta's turn to speak in opposition to the ICE agreement began about fifty minutes later. Approximately two minutes

---

[4] Costa Mesa Municipal Code § 2-63 authorizes inquiry into speaker representation: "In order to expedite matters and to avoid repetitious presentations, whenever any group of persons wishes to address the council on the same subject matter, it shall be proper for the presiding officer to inquire whether or not the group has a spokesman and if so, that he be heard with the following speakers in the group to be limited to facts not already presented by the group spokesman."

into his remarks, Acosta turned away from the council and toward the audience to ask members who agreed with his viewpoint to stand. The Mayor interrupted him, saying, "No, we're not going to do that." In defiance of that order, still facing the audience, Acosta nonetheless said "Do it" three times. Approximately twenty to thirty people stood up in response to his urging and some began clapping. The Mayor then abruptly recessed the meeting and indicated the council would return in a few minutes.

Acosta then turned back to face the departing council in an attempt to complete his speech. As he did so, an officer approached him at the podium. Acosta testified that at first the officers told him his time was up and moved the microphone. The officers asked Acosta to step down from the podium and leave the chambers, but Acosta did not immediately comply. Instead he repeatedly asked why his speaking time was cut short and why he was being asked to leave the podium. The officers then tried to quietly escort him out of the chambers, but Acosta stopped and asked to retrieve his notes from the podium. After he retrieved his notes, Acosta began to tell the officers not to touch him and jerked away from their attempts to guide him out of the room.

Chief Hensley approached the group and directed his officers to take Acosta out of the Council Chambers. The officers again tried to guide Acosta away from the podium, but Acosta attempted to prevent his removal by leaning away from the officers and planting his feet. Sergeant Glass testified that Acosta was "not complying" with their requests to leave and he was "stomping or placing his feet to hesitate or hamper his movement." The officers then took Acosta's arms. Acosta alleged that the officer behind him also wrapped his arm around Acosta's neck, similar to a choke

hold, and that the officers kicked, dragged, and punched him while removing him. Sergeant Glass testified that Lieutenant Andersen applied an upper-body control hold with his arm across Acosta's chest and the video recording, submitted by Acosta, does not show any kind of kicking or punching.

At this point, the officers testified he was not under arrest, but only being removed to help diffuse an escalating situation. Once the officers were outside the Council Chambers, however, they encountered a large crowd and Acosta increased his efforts to resist the officers. When the officers attempted to move Acosta into the City Hall and away from the volatile crowd of demonstrators outside City Hall (some of whom threw objects at the police), Acosta wrapped his legs and arms around a pole in an attempt to prevent the officers from moving him. The officers separated him from the pole and began moving him toward the City Hall. Acosta continued to resist, causing himself and an officer to fall to the ground. Once inside the City Hall, Acosta was placed in handcuffs. Chief Hensley and another witness testified that Acosta complained that the cuffs were making his arms hurt.

Acosta brought eleven claims against Mayor Mansoor, Chief Hensley, the City, and certain individual police officers. The claims relevant to this appeal include: (1) a First Amendment facial challenge to § 2-61; (2) a facial challenge to § 2-61 under the free speech clause of the California Constitution; (3) a request for a declaration that the defendants enforced § 2-61 in an unconstitutional manner; (4) a claim that he was unreasonably and unlawfully seized in violation of the Fourth Amendment; (5) an as-applied challenge to § 2-61 under the First Amendment; and (6) an as-applied claim under the California Constitution that sought

damages. At the district court and here, the core of Acosta's argument is that § 2-61 unconstitutionally restricts speech and that as applied to him the defendants selectively enforced § 2-61 based upon Acosta's opposition and criticism of the Mayor and Council Members who supported the ICE agreement.

The defendants moved to dismiss the complaint. The district court dismissed without prejudice Acosta's facial challenges under both the U.S. and California Constitutions, but denied the motion as to the remaining claims because there were material questions of fact that a jury needed to decide—the most significant being whether Acosta's behavior disrupted the Council meeting. The court also concluded the Mayor was entitled to discretionary act immunity as to all of Acosta's state-law claims to the extent that he sought monetary damages and granted the City public entity immunity for Acosta's as-applied challenges under the California Constitution to the extent that he sought damages.

Subsequently, the court granted in part and denied in part the defendants' motion for summary judgment. The district court denied summary judgment of Acosta's as-applied challenge under the First Amendment against the Mayor and the City because material facts were disputed, but granted it as to the officer defendants on grounds of qualified immunity when they carried out orders to remove Acosta from the room. The court also denied summary judgment on Acosta's claim for declaratory relief and his federal due process claims against the Mayor and the City. The court granted summary judgment in favor of all the defendants on Acosta's state law free speech claim, and in favor of the police-officer defendants as to his Fourth Amendment, federal due process, and false arrest claims.

The jury heard Acosta's First and Fourteenth amendment claims arising under 42 U.S.C. § 1983 against the Mayor and the City. The jury implicitly found his conduct disruptive when it rejected these claims.[5] After trial, Acosta moved for renewed judgment as a matter of law and for a new trial. Defendants also requested entry of judgment on Acosta's declaratory judgment claim not tried to the jury. The district court denied both the motion for renewed judgment and Acosta's request for declaratory relief. Acosta now appeals.

## II

Acosta first argues that the district court erred when it dismissed his claim that § 2-61 is facially invalid. We review the district court's dismissal of a claim de novo. *Kennedy v. S. Cal. Edison Co.*, 268 F.3d 763, 767 (9th Cir. 2001). We also analyze the constitutionality of a statute de novo. *Planned Parenthood of S. Ariz. v. Lawall*, 307 F.3d 783, 786 (9th Cir. 2002).

---

[5] We can determine that the jury made this finding by analyzing the jury instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."). Jury Instruction No. 27 provided that "In enforcing Costa Mesa Municipal Code sections 2-61 and 2-64, the defendant Alan Mansoor may bar a speaker from further audience before the City council only if the speaker's activity itself . . . substantially impairs the conduct of the meeting." Jury Instruction No. 28 further provided that "Whether a given instance of alleged misconduct substantially impairs the effective conduct of a meeting depends on the actual impact of that conduct on the course of the meeting." Finally, Jury Instruction No. 29 stated that "A speaker may not be removed from a meeting solely because of the use of profanity unless the use of profanity actually disturbs or impedes the meeting." Thus, to conclude that Mayor Mansoor did not violate Acosta's First Amendment rights, the jury must have concluded that Acosta's conduct substantially impaired the conduct of the meeting.

On appeal, Acosta argues that § 2-61 is facially invalid, because it is overbroad.  Section 2-61 states:

> Propriety of conduct while addressing the council.
>
> (a) The *presiding officer* at a meeting may in his or her discretion bar from further audience before the council, or have removed from the council chambers, any person who commits *disorderly, insolent, or disruptive behavior*, including but not limited to, the actions set forth in (b) below.
>
> (b) It *shall be unlawful* for any person while addressing the council at a council meeting to violate any of the following rules after being called to order and warned to desist from such conduct:
>
>> (1) No person shall make any *personal, impertinent, profane, insolent, or slanderous remarks*.
>>
>> (2) No person shall yell at the council in a loud, disturbing voice.
>>
>> (3) No person shall speak without being recognized by the presiding officer.
>>
>> (4) No person shall continue to speak after being told by the presiding

officer that his allotted time for addressing the council has expired.

(5) Every person shall comply with and obey the lawful orders or directives of the presiding officer.

(6) No person shall, by disorderly, insolent, or disturbing action, speech, or otherwise, substantially delay, interrupt, or disturb the proceedings of the council.

Costa Mesa, Cal., Mun. Code § 2-61 (2012) (emphasis added). We will invalidate this section as "overbroad," violating the First Amendment, if "a substantial amount of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (internal quotation marks omitted). Although "[t]he concept of 'substantial overbreadth' is not readily reduced to an exact definition," it generally means that we will not invalidate a statute on its face unless "there [is] a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800–01 (1984). An ordinance that governs the decorum of a city council meeting is "not facially overbroad [if it] only permit[s] a presiding officer to eject an attendee for *actually* disturbing or impeding a meeting." *Norse v. City of Santa Cruz*, 629 F.3d 966, 976 (9th Cir. 2010) (en banc) (emphasis added). However, actually disturbing or impeding a meeting means "[a]ctual disruption" of the meeting; a municipality cannot merely define

disturbance "in any way [it] choose[s]," e.g., it may not deem any violation of its rules of decorum to be a disturbance. *Id.*

With that foundation, "the first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Stevens*, 130 S. Ct. at 1587 (internal quotation marks omitted). In doing so, we must apply California's rules of statutory construction, as no courts have previously construed § 2-61. *Cassell v. Kolb* (*In re Kolb*), 326 F.3d 1030, 1037 (9th Cir. 2003). Thus, we must give the ordinance's language "its usual, ordinary import and accord[ ] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose." *Dyna-Med, Inc. v. Fair Emp't. & Hous. Comm'n*, 43 Cal. 3d 1379, 1386–87 (1987). In doing so, we must also apply two principles: "First, the enactment may be validated if its terms are reasonably susceptible to an interpretation consistent with the [C]onstitution. Second, [we] should construe the enactment so as to limit its effect and operation to matters that may be constitutionally regulated or prohibited." *People v. Superior Court* (*Anderson*), 199 Cal. Rptr. 150, 151 (Ct. App. 1984).

Applying these principles, we conclude that Costa Mesa Municipal Ordinance § 2-61 is overbroad on its face, and that no reasonable construction can eliminate its overbreadth. Further, the overbroad terms in § 2-61 are not severable under California law. Therefore, we must invalidate § 2-61 as presently written in its entirety.

## A

First, we must determine if we can construe § 2-61 such that it will not reach a "substantial amount of constitutionally protected conduct." *City of Houston v. Hill*, 482 U.S. 451, 459 (1987). Acosta argues that the language of § 2-61(b)(1) makes all of § 2-61 overbroad, so we will begin our analysis there. Section 2-61(b)(1) prohibits "any personal, impertinent, profane, insolent, or slanderous remarks." Acosta argues that this prohibition impermissibly "regulates protected speech based on the viewpoints expressed," because "favorable, complimentary, or positive speech" would not violate the ordinance. If subsection (b)(1) does reach such speech, it is unconstitutional. *See Rosenberger v. Univ. of Va.*, 515 U.S. 819, 828–29 (1995). However, before arriving at that conclusion, we must analyze whether § 2-61 can be construed to avoid the constitutional issue subsection (b)(1) introduces. *Anderson*, 199 Cal. Rptr. at 151.

The City suggests three possible constructions of the ordinance to solve the constitutional defect. First, subsection (a) should be read as a limit on subsection (b) and subsection (a) should be read to require that speech cause an actual disruption before the presiding officer may stop it. Second, subsection (b) should be read as a list of "examples of the types of *actions*, as opposed to mere words, that might constitute disruptive behavior" in subsection (a).[6]  Third,

---

[6] The ordinance may reach protected speech, even though it uses the words "action" or "behavior." The Supreme Court has frequently rejected attempts to regulate speech under the guise of regulating conduct. *See Cohen v. California*, 403 U.S. 15, 18 (1971) ("The only 'conduct' which the State sought to punish is the fact of communication."); *Texas v. Johnson*, 491 U.S. 397, 416 (1989) ("The distinction between written or spoken words and nonverbal conduct . . . is of no moment where the

subsection (b)(6) should be read as a limitation on the entire section (the City offered this reading of the statute at oral argument). We discuss each of these alternatives below.

**1**

Because the City's first and second potential constructions are not reasonable ways to read the statute, we cannot adopt them. Both depend on a relationship between subsection (a) and subsection (b) that the text of the ordinance does not support. Specifically, the City suggests that we read subsection (b) in connection with, and as limited by, subsection (a). However, no language in subsection (a) indicates that it limits subsection (b) in all cases, whenever subsection (b) is violated. On the contrary, by declaring the listed speech and behavior "unlawful," the City gave subsection (b) a legal effect independent of subsection (a). Even though subsections (a) and (b) are part of the same statutory section, we refuse to forge a connection between them that goes beyond what the text of the ordinance permits.

The text of § 2-61 is different from the ordinance at issue in *White v. City of Norwalk*, 900 F.2d 1421 (9th Cir. 1990). There, the court concluded that the following ordinance *was* susceptible to a limiting construction, though the first sentence (which parallels the language of subsection (b)(1) in the instant case) was unconstitutional on its own:

---

nonverbal conduct is expressive, as it is here, and where the regulation of that conduct is *related to expression*, as it is here." (emphasis added)). Thus, because certain "remarks" or "behavior" can be unlawful merely because of their expressive nature, the conclusion that the ordinance reaches only "conduct" is not a narrowing construction that will save it.

> 3. Persons Addressing the Council . . . Each person who addresses the Council shall not make *personal impertinent, slanderous or profane remarks* to any member of the Council, staff or general public.  Any person who makes *such remarks*, or who utters loud, threatening, personal or abusive language, or engages in any *other disorderly conduct* which *disrupts, disturbs or otherwise impedes* the orderly conduct of any Council meeting shall, at the discretion of the presiding officer or a majority of the Council, be barred from further audience before the Council during that meeting . . . .

900 F.2d at 1424 (emphasis added).  The court determined that the second sentence in the section (beginning "Any person who makes . . .") could readily be interpreted to modify the overbroad first sentence, because it included adjectives that clearly referred to the speech described in the first sentence ("such remarks" and "other disorderly conduct").  *Id.*  Because the second sentence modified the first, the series of qualifiers indicating that the prohibited conduct must be conduct which "disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting" limited the potential applications of the statute to speech that caused an actual disturbance.  *Id.*  The requirement of actual disruption meant that the ordinance was valid.

Like the ordinance in *White*, § 2-61 prohibits the making of "personal, impertinent, profane, insolent or slanderous remarks."  That, without limitation, is an unconstitutional prohibition on speech.  However, unlike the ordinance in

*White*, § 2-61 is not "readily susceptible" to a narrowing construction that would render it constitutional.  No textual link ties subsection (a) to subsection (b) like the second sentence of the ordinance in *White* was tied to the first.

In addition to being grammatically independent, subsections (a) and (b) appear to have distinct purposes. Subsection (a) authorizes a meeting's presiding officer to deal with a person who engages in certain types of conduct when addressing the City Council.  Subsection (b) prohibits persons who are addressing the City Council from engaging in certain types of conduct.  Subsections (a) and (b) are related, because (b) provides the presiding officer with a non-exclusive list of grounds for exercising the authority that subsection (a) confers on him or her; the text does not support reading these two sections together any other way.  Thus, subsections (a) and (b) can only fairly be read together when two predicates are satisfied: (1) a person addressing the City Council engages in conduct that subsection (b) prohibits, and (2) the presiding officer takes adverse action against that person based on that conduct.

Other provisions of the Costa Mesa Municipal Code give subsection (b) independent effect in circumstances where subsection (a) might not operate (e.g., a person engages in conduct that subsection (b) prohibits, but the presiding officer does not exercise his power under subsection (a)).  For example, § 2-66 authorizes the sergeant-at-arms (who, at the January 3 meeting, was Chief Hensley) to "arrest any person violating the provisions" of Chapter III of the Code.  Costa Mesa, Cal., Mun. Code § 2-66.  Additionally, § 1-34(a) authorizes civil fines to be imposed for "any violation of the provisions of [the] Code."  Costa Mesa, Cal., Mun. Code § 1-34(a).  These sections give § 2-61(b) independent legal

significance, because engaging in the enumerated "unlawful" behaviors would subject the violator to arrest, a civil fine, or both.[7]   Nothing in the language of § 2-61 indicates that subsection (a) limits the circumstances in which subsection (b) triggers these sanctions.

Moreover, § 2-60 clarifies that the drafters of the Code use the formulation "it shall be unlawful" to have independent legal significance.  The text of that section is as follows:

> Propriety of conduct of council members.
>
> (a) Members of the council shall preserve order and decorum during a meeting.
>
> (b) It shall be unlawful for any member of the council to violate any of the following rules:
>
>> (1) Members of the council shall not, by disorderly, insolent or disturbing action, speech, or otherwise, substantially delay, interrupt or disturb the proceedings of the council.
>>
>> (2) Members of the council shall obey and carry out the lawful orders or directives of the presiding officer.

---

[7] This feature of the ordinance further distinguishes it from the ordinance at issue in *City of Norwalk*, which authorized police officers to "remove" someone from a city council meeting only upon an "order" from the presiding officer.  900 F.2d at 1424.

Costa Mesa, Cal., Mun. Code § 2-60.  Like subsection (b) of § 2-61, subsection (b) of § 2-60 prohibits specific types of conduct by declaring them to be "unlawful."  However, § 2-60 does not contain a provision that authorizes a city official to deal with a person engaged in the prohibited conduct, like subsection (a) in § 2-61.  Presumably, enforcement power must be provided by some other part of the Code (such as § 2-66 or § 1-34(a)) if these prohibitions are to have any coercive effect.  Therefore, the drafters of the Code employ the formulation "it shall be unlawful" to trigger the sanctions available for "violations" of the code whenever a person engaged in the "unlawful" conduct.

Thus, it would be reasonable to assume that the drafters intended § 2-61(b) to have the same effect as § 2-60(b) when they used the same "it shall be unlawful" formulation there. Namely, a violation of subsection (b) will trigger potential sanctions under § 2-66 and § 1-34 *in addition* to those sanctions available under § 2-61(a).  Therefore, subsection (b) has legal significance independent of subsection (a).  There is no textual basis for reading subsection (b) together with subsection (a) in such applications.  As such, a person may be fined or arrested for violating subsection (b)(1), regardless of whether his "personal, impertinent, profane, or slanderous remarks" are actually "disruptive."  Although we must adopt a constitutional construction of § 2-61 if such a reading is fairly possible, the City's first two suggested constructions do not meet that standard.

**2**

Even if subsection (a) provided a blanket limitation like the City suggests, that would not be enough to validate the statute.  The items in the series of narrowing qualifiers in

subsection (a) ("disorderly, *insolent*, or disruptive behavior") are different from the series of narrowing qualifiers in *White*, 900 F.2d at 1426 ("disrupts, disturbs, or otherwise impedes"). All three items in *White*'s qualifying list refer to actions creating some type of actual disruption. *See* 900 F.2d at 1424. Thus, these qualifiers satisfy *Norse*'s requirement that rules of decorum should "only permit a presiding officer to eject an attendee for *actually* disturbing or impeding a meeting." 629 F.3d at 976 (emphasis added).

Here, subsection (a) imposes no such limitation. Only the words "disorderly" and "disruptive" are qualifiers that refer to actual disruption of the city proceedings. The third qualifier merely prohibits "insolent" behavior. The Costa Mesa Municipal Code does not define the term "insolent." "When terms are not defined within a statute, they are accorded their plain and ordinary meaning, which can be deduced through reference sources such as general usage dictionaries." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1041 (9th Cir. 2011). Webster's Third defines "insolent" as "*haughty* and *contemptuous* or brutal in behavior or language" or "lacking usual or proper respect for rank or position." Webster's Third New International Dictionary 1170 (emphasis added). This type of expressive activity could, and often likely would, fall well below the level of behavior that actually disturbs or impedes a City Council proceeding.

Furthermore, we cannot read the words "disruptive" or "disorderly," which surround the term "insolent," as a modification of that term. California courts follow the common rule of statutory construction that gives disjunctive and distinct meaning to items separated by the word "or." *In re Jesusa V.*, 85 P.3d 2, 24 (Cal. 2004) ("The ordinary and

popular meaning of the word 'or' is well settled. It has a disjunctive meaning: In its ordinary sense, the function of the word 'or' is to mark an alternative such as either this or that." (internal citation and quotation marks omitted)); *see also In re C.H.*, 264 P.3d 357 (Cal. 2011) (same). Thus, because "insolent" is separated from "disorderly" and "disruptive" by the word "or," it must be interpreted to mean something distinct.

Therefore, even if subsection (a) does limit subsection (b), it does not limit it in a way that alleviates any constitutional infirmity in subsection (b)(1). Any activity discussed under subsection (b) that is also merely "insolent" under subsection (a) is prohibited under the plain terms of the City's ordinance. For instance, a "remark[]" that is "personal," "impertinent," "profane," or "insolent" under subsection (b)(1), could be "insolent . . behavior" under subsection (a), justifying removal of the speaker. Accordingly, a comment amounting to nothing more than bold criticism of City Council members would fall in this category, whereas complimentary comments would be allowed.[8] Nothing guarantees that such a comment would rise to the level of actual disruption. Thus, the ordinance allows the City to prohibit non-disruptive speech that is subjectively "impertinent, "insolent," or essentially offensive, even when subsection (a) is read as limiting subsection (b)(1).

---

[8] Furthermore, because subsection (a) authorizes the presiding officer at a meeting to "bar from further audience before the council, or have removed from the council chambers, any person who commits . . . insolent . . . behavior," subsection (a) itself is constitutionally infirm. The unqualified term "insolent" in subsection (a) opens the door to discrimination based on viewpoint, just like the term "insolent" in subsection (b)(1).

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (collecting cases); *see also R.A.V. v. St. Paul*, 505 U.S. 377, 392 (1992) ("[Government] has no [authority] to license one side of a debate to fight freestyle, while requiring the other to follow the Marquis of Queensbury rules."). Neither of the first two alternative constructions proposed by the City will save the ordinance, because they would permit City officials to prohibit speech on precisely those grounds.

**3**

We also reject the City's third proposed construction, because it too depends on reading the statute in a way that the text does not permit. The City argues that subsection (b)(6) can be read as a limit on the entire statute. However, by its terms, subsection (b)(6) is only one of many examples under subsection (a) of how someone who is addressing the City council might act in a "disorderly, insolent, or disruptive" manner. Nothing textually about subsection (b)(6) limits anything in the rest of § 2-61. Additionally, it is difficult to square the City's argument that subsection (b)(6) limits all of § 2-61, with its argument that § 2-61(a) does the same thing.

**4**

We conclude that § 2-61 is overbroad, because it unnecessarily sweeps a substantial amount of non-disruptive, protected speech within its prohibiting language. *See Vlasak v. Super. Ct. of Cal. ex rel. Cnty. of L.A.*, 329 F.3d 683, 689 (9th Cir. 2003). In *White*, the court explained that, while a

speaker may be stopped "if his speech becomes irrelevant or repetitious," even in a limited public forum "a speaker may not be stopped from speaking because the moderator disagrees with the viewpoint he is expressing." 900 F.2d at 1425; *see also Chaker v. Crogan*, 428 F.3d 1215, 1226–27 (9th Cir. 2005) (statute that prohibits false statements complaining about the actions of a police officer, while permitting false statements in support of a police officer, is a viewpoint discriminatory violation of the First Amendment). The City has not offered a fairly possible limiting construction that would prevent city officials from enforcing § 2-61 against such speech (and we could not come up with one). In fact, other City ordinances demonstrate that § 2-61 could have been written more narrowly. *See* Costa Mesa, Cal., Mun. Code § 2-64 ("It shall be unlawful for any person in the audience at a council meeting to do any of the following . . . (1) Engage in disorderly, disruptive, disturbing, delaying or boisterous conduct, such as, but not limited to, handclapping, stomping of feet, whistling, making noise, use of profane language or obscene gestures, yelling or similar demonstrations, which conduct substantially *interrupts, delays, or disturbs* the peace and good order of the proceedings of the council." (emphasis added)); *see also id.* § 2-60 ("Members of the council shall not, by disorderly, insolent, or disturbing action, speech, or otherwise, substantially *delay, interrupt or disturb* the proceedings of the council." (emphasis added)). Therefore, § 2-61 is unconstitutional as written.

We note that this statute appears to be like the one that the Supreme Court invalidated in *Hill*, 482 U.S. at 455, 461. In *Hill*, the Court held that a city ordinance that made it unlawful for a person "to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the

execution of his duty" was unconstitutionally overbroad. *Id.* The Court determined that the "ordinance criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement." *Id.* at 466–67 (emphasis added). "Far from providing the breathing space that First Amendment freedoms need to survive," the Court concluded that "the ordinance is susceptible of regular applications to protected expression," making it overbroad. *Id.* (internal citation and quotation marks omitted). We reach the same conclusion here with respect to § 2-61(b)(1).

**B**

Although § 2-61 is unconstitutional as written, we can avoid invalidating the entire section if we can sever the unconstitutional elements from the ordinance. To do so, we must analyze both (1) whether we can sever the term "insolent" from subsection (a), and (2) whether we can sever the terms "personal, impertinent, profane, insolent" from subsection (b)(1).**[9]** The City of Costa Mesa has declared that an unconstitutional "phrase, clause, sentence, paragraph [or] section" of the Code should be severed in order to uphold the constitutional parts of the Code. *See* Costa Mesa, Cal., Mun.

---

**[9]** It is unnecessary to determine whether all of subsection (b)(1) is invalid, because its prohibition on slander, which is unprotected by the First Amendment, *see Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245–46 (2002), does not raise any constitutional concerns. Additionally, though subsection (b)(6) also contains the term "insolent," it does not prohibit such speech unless it "substantially delay[s], interrupt[s], or disturb[s] the proceedings of the council." Costa Mesa, Cal., Mun. Code § 2-61(b)(6). Arguably, this satisfies *Norse*'s actual disturbance requirement and—because Acosta does not address it—we will not analyze it further.

Code § 1-32. Despite this authorization, the ordinance is only constitutional if the text to be severed is volitionally, grammatically, and functionally severable. *McMahan v. City & Cnty. of San Francisco*, 26 Cal. Rptr. 3d 509, 513 (Ct. App. 2005); *MHC Fin. Ltd. P'ship Two v. City of Santee*, 23 Cal. Rptr. 3d 622, 639 (Ct. App. 2005); *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 772 (1988) ("Severability of a local ordinance is a question of state law . . . ."). Here, we begin with volitional severability, the "most important" factor in the severability analysis.[10] *See Katz v. Children's Hosp. of Orange Cnty.*, 28 F.3d 1520, 1531 (9th Cir. 1994). We conclude that § 2-61 cannot pass the test for volitional severability, which is fatal to the severability analysis. *McMahan*, 26 Cal. Rptr. 3d at 513 ("All three criteria must be satisfied.").

---

[10] At oral argument, the City made an offhand remark that it favored severance over complete invalidation. It neither briefed this argument, nor raised it below. Regardless, it does not effect our view of volitional severability. California courts look to what the intentions were of the enacting body *at the time of enactment* to determine whether volitional severability is met. *See Gerken v. Fair Political Practices Comm'n*, 863 P.2d 694, 699 (Cal. 1993). They do not look to the *post hoc* litigating position taken by the government with respect to what should be done to the statute. In fact, it is likely in most cases where a municipal enactment is invalidated that the enacting municipality would prefer severance to complete invalidation. *See, e.g.*, *Long Beach Lesbian & Gay Pride, Inc. v. City of Long Beach*, 17 Cal. Rptr. 2d 861, 868 (Ct. App. 1993) (stating municipal defendant's argument in favor of severance of unconstitutional part of statute rather than complete invalidation). The fact that the City in this case took just such a position is unremarkable and is not relevant to determining what the City intended when it enacted this provision.

**1**

Text passes the test for volitional severability if "it can be said with confidence that the [enacting body]'s attention was sufficiently focused upon the parts to be [validated] so that it would have separately considered and adopted them in the absence of the invalid portions." *Gerken v. Fair Political Practices Comm'n*, 863 P.2d 694, 699 (Cal. 1993) (alterations omitted). In this case, as in *McMahan*, the "text of the initiative underscore[s] its primary objective." 26 Cal. Rptr. 3d at 514. Looking to the text of § 2-61, it is not at all clear that the enacting body's "attention was sufficiently focused" on the purpose of only prohibiting disruptive conduct such that this ordinance would have still been passed in its constitutional form, e.g., if it only prohibited disruptive conduct. *See Gerken*, 863 P.2d at 699. Subsection (a) prohibits "insolent" behavior (which could include speech), and subsection (b)(1) prohibits "personal, impertinent, profane, insolent . . . remarks," even if the speech does not cause a disruption. However, these terms are interwoven with other adjectives that describe categories of speech, which it is constitutional for the City to prohibit. Assuming that the City's purpose in enacting § 2-61 was to regulate both disruptive and non-disruptive speech, we cannot say that its attention was sufficiently focused on only employing § 2-61 to prohibit disruptive speech.

The "intended function of [the] particular statutory scheme" as a whole supports our conclusion that § 2-61 fails the volitional severability prong. *Barlow v. Davis*, 85 Cal. Rptr. 2d 752, 758 (Ct. App. 1999); *Briseno v. City of Santa Ana*, 8 Cal. Rptr. 2d 486, 490 (Ct. App. 1992) (analyzing the "overall statutory scheme" to determine legislative intent). Section 2-61 clearly prohibits expressive speech by

employing the term "insolent" without qualification, whereas other sections of the City's ordinances only prohibit speech that "substantially delays, interrupts or disturbs" a meeting. *See, e.g.*, Costa Mesa, Cal., Mun. Code § 2-60 ("It shall be unlawful for any member of the council to . . . by disorderly, insolent or disturbing action, speech, or otherwise, substantially delay, interrupt or disturb the proceedings of the council"); *id.* § 2-64 ("It shall be unlawful for any person in the audience at a council meeting to . . . [e]ngage in disorderly, disruptive, disturbing, delaying or boisterous conduct . . . which conduct substantially interrupts, delays, or disturbs the peace and good order of the proceedings of the council."). In previous cases, we have explained that, when the enacting body uses language that is distinct from similar statutes, we must give meaning to that distinction. *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 937 (9th Cir. 2004). In *Wasden*, we held that "the fact that Idaho chose to provide a novel definition, narrower than those given in more than half of its sister states, obligates us to consider what it meant by making that considered choice." *Id.* Similarly here, use of appropriate qualifying language by the City of Costa Mesa in § 2-60 and § 2-64 demonstrates that the City knew how to enact an ordinance aimed at preventing actual disturbances of council meetings. The City's choice to go further in § 2-61 by prohibiting "insolent" speech and "personal, impertinent, profane . . . remarks" demonstrates a meaningful difference that we cannot ignore, indicating that the City intended these prohibitions to be a functional aspect of § 2-61.

*Metromedia, Inc. v. City of San Diego*, 649 P.2d 902 (Cal. 1982) supports this analysis. There, the California Supreme Court explained that "we know of no precedent for holding that a clause of a statute, which as enacted is unconstitutional,

may be changed in meaning in order to give it *some operation*, when admittedly it cannot operate as the Legislature intended." *Metromedia*, 649 P.2d at 908 n.10 (emphasis added) (quoting *People v. Perry*, 21 P. 423 (Cal. 1889)). On that basis, the court refused to sever portions of a statute where it was "doubtful whether the purpose of the original ordinance is served by a truncated version" and the severance would "leave the city with an ordinance different than it intended, one less effective in achieving the city's goals." *Id.* at 909.[11] Here, by severing the unconstitutional terms from § 2-61, we would similarly leave an ordinance that no longer prohibits the speech the City intended it to prohibit.

Based on the foregoing, we are not "confident" that the City would have enacted § 2-61 without the parts we have determined to be unconstitutional. *Cf. McMahan*, 26 Cal. Rptr. 3d at 516 (finding provisions of law volitionally severable when court "confident that the provisions [to be retained after severance] would have received the endorsement of the vast majority of voters, even [without the unconstitutional part]"). Therefore, the volitional severability prong is not satisfied. As a result, neither the term "insolent" in subsection (a), nor the terms "personal, impertinent, profane, insolent" in subsection (b)(1) can be severed from § 2-61. *McMahan*, 26 Cal. Rptr. 3d at 513 ("All three criteria must be satisfied."). Because these terms cannot be severed and § 2-61 is not reasonably susceptible to a narrowing

---

[11] In *Katz v. Children's Hospital of Orange Cnty.*, 28 F.3d 1520, 1531 (9th Cir. 1994), we were willing to interpret the statutory language "to mean something other than what it says," only because a previous California court had already interpreted the statute in that way. We have no such precedent here.

construction, we must invalidate the entire section on this basis alone.  We nonetheless analyze the remaining two prongs, grammatical and functional severability.

**2**

Text is grammatically (or "mechanically") severable only when it constitutes a "physically separate section[] of the proposition."  *Santa Barbara Sch. Dist. v. Superior Court*, 530 P.2d 605, 618 (Cal. 1975).  Thus, when California courts have concluded that text was grammatically severable, the text was severed from language that was in an entirely different sentence or section of the statute, making it grammatically "complete and distinct."  *People's Advocate, Inc. v. Superior Court*, 226 Cal. Rptr. 640, 648–49 (Ct. App. 1986); *see also Gerken*, 863 P.2d at 698 ("Petitioners concede the various remaining parts of Proposition 73 meet the" grammatically separable requirement for the severability test, because the severed portion was an entirely separate provision of the statute); *Calfarm Ins. Co. v. Deukmejian*, 771 P.2d 1247, 1256 (Cal. 1989) (the invalid provision in this case was "distinct and separate" and could be "removed as a whole without affecting the *wording* of any other provision" (emphasis added));  *McMahan*, 26 Cal. Rptr. 3d at 513 ("appellants concede[d] the invalid funding mandate [was] grammatically severable" because it was a completely separate portion of the statute); *Barlow*, 85 Cal. Rptr. 2d at 757 (the invalid portion could be severed because it constituted an "entirely separate statute grammatically and mechanically from the invalid substantive provisions"); *Briseno*, 8 Cal. Rptr. 2d at 490 (the unconstitutional word did "not even appear in [the] section" at issue); *Santa Barbara Sch. Dist.*, 530 P.2d at 617–18 (the text severed was a separate and distinct statutory provision).

First we address whether the word "insolent" is grammatically severable from subsection (a) of § 2-61. No California cases hold that one word and the two commas surrounding it are grammatically severable from statutory text. By contrast, at least two California cases dealing with a similar issue refused to sever one unconstitutional word from a sentence. *See Cnty. of Sonoma*, 93 Cal. Rptr. 3d at 61–62 (refusing to sever the word "unanimous" from the middle of text); *Long Beach Lesbian & Gay Pride, Inc. v. City of Long Beach*, 17 Cal. Rptr. 2d 861, 867–68 (Ct. App. 1993) (refusing to follow the city's request of replacing "may" with "shall" in the middle of a statutory sentence). Indeed, in *City of Long Beach*, the court determined that neither the offending word "may" nor the remaining unconstitutional section could be removed to save the ordinance. *Id.* at 867–69. Further, to so alter subsection (a) would contravene California's prohibition against "affecting the wording of any other provision." *Calfarm Ins. Co.*, 771 P.2d at 1256; *accord Barlow*, 85 Cal. Rptr. 2d at 757; *Maribel M. v. Superior Court*, 72 Cal. Rptr. 2d 536, 541 (Ct. App. 1998). Thus, while distinct sections can be "*separated* by [a] paragraph, sentence, clause, phrase or even [a] single word[]," *Barlow*, 85 Cal. Rptr. 2d at 757, grammatical severability does not permit a single word to be excised from the middle of a clause or phrase.

Next we analyze whether a grouping of individual words, "personal, impertinent, profane, insolent" is severable from the surrounding text in subsection (b). For the same reasons just discussed with respect to severing the term "insolent" from subsection (a), we conclude that these words are not grammatically severable from subsection (b). Although this grouping contains more than one word, the same concerns with severing a single word from a sentence apply to severing

a group of individual words from a sentence. Unlike a clause or phrase, the grouping of individual words does not form a complete grammatical unit expressing one legislative thought. Were we to excise single words (or groups of individual words), we would be "rewrit[ing] [the ordinance] in order to save it." *United States v. Buckland*, 289 F.3d 558, 564 (9th Cir. 2002).

The terms of Costa Mesa's severability clause, while not determinative, support our conclusion that the individual words at issue are not grammatically severable from their surrounding text. The specific language of "the severability clause [is] considered in conjunction with the separate and discrete provisions of" the text to determine whether the "grammatical component of the test for severance is met." *Barlow*, 85 Cal. Rptr. 2d. at 757 (internal quotation marks omitted). Here, the City's severability clause only states that "sections, paragraphs, clauses and phrases of this Code are severable," rather than individual words. Costa Mesa, Cal., Mun. Code § 1-32. Therefore, the severability clause indicates that the City did not intend something less than a phrase to be grammatically severable.

**3**

Finally, the unconstitutional words must also be functionally severable if we are to only excise the invalid terms while upholding the remainder of the ordinance. Text is functionally severable if it is not necessary to the ordinance's operation and purpose. *City of Long Beach*, 17 Cal. Rptr. 2d at 868–69. Neither the term "insolent" in subsection (a) nor the terms "personal, impertinent, profane, insolent" in subsection (b)(1) can be said to be unnecessary to the operation and purpose of § 2-61 as enacted by the City

of Costa Mesa. Drawing on the foregoing plain text analysis, one of the purposes of the ordinance is to prohibit certain classes of expressive speech by persons addressing the City Council, even if it does not disturb or disrupt the conduct of the meeting. Excising these terms from § 2-61 removes non-disruptive, non-disturbing speech from the scope of the ordinance's operation.

The testimony of the Chief of Police in this case demonstrates that the term "insolent" was not unnecessary to the operation of § 2-61. The Chief testified at trial that city officials relied on the word "insolent" as a key part of effectuating § 2-61's purpose of prohibiting protected speech. When asked whether § 2-61 "allowed [the police] to arrest the persons *insolent*," he answered, "Yes." The Chief also answered affirmatively when asked whether § 2-61 "was enforced in Costa Mesa" such that it "would be [a] violation[] of the municipal code" to make "insulting remarks."

The Chief of Police's testimony here parallels that of a city official in *City of Long Beach*. In that case, the official charged with enforcing the ordinance testified that the ordinance could be enforced in an unconstitutional way. *City of Long Beach*, 17 Cal. Rptr. 2d at 868. The court then held that, when "[f]aced with . . . ambivalence by the official charged with enforcing the section, [courts] *cannot* depart from its plain language." *Id.* (emphasis added). Likewise here, the Chief's testimony that § 2-61 is enforced unconstitutionally affirms our conclusion that the unconstitutional text is not functionally severable from § 2-61.

**4**

If a statute does not meet any one criteria (grammatical, functional, *or* volitional severability), then a court may not sever text from a statute. *McMahan*, 26 Cal. Rptr. 3d at 513. Section 2-61 satisfies none of them, so it must be invalidated as a whole. Even though invalidation of the entire provision for overbreadth is a harsh remedy, it is necessary when we cannot reconcile full protection for First Amendment liberties with the discernable intent of the enacting body. "[G]radually cutting away the unconstitutional aspects of a statute by invalidating its improper applications case by case . . . does not respond sufficiently to the peculiarly vulnerable character of activities protected by the first amendment." *People v. Rodriguez*, 77 Cal. Rptr. 2d 676, 683 (Ct. App. 1998); *see also In re Berry*, 436 P.2d 273, 286 (Cal. 1968) (finding "the doctrine of severability. . . inapplicable" where "a provision encompasses both valid and invalid restrictions of free speech and its language is such that a court cannot reasonably undertake to eliminate its invalid operation by severance or construction" despite the existence of a severability clause). For an "overbroad law hangs over people's heads like a Sword of Damocles." *Rodriguez*, 77 Cal. Rptr. 2d at 683 (internal quotation marks and alterations omitted). By invalidating § 2-61 in its entirety, we eliminate the Dionysian threat that the ordinance presents to those who are addressing the City of Costa Mesa City Council.

**III**

We turn next to Acosta's claim that the district court improperly granted summary judgment on his as-applied challenge to § 2-61 in favor of the City on grounds of public entity immunity to the extent that he sought damages.

**A**

As a threshold matter, we note that our determination that § 2-61 is facially overbroad does not impact the district court's or our determination of Acosta's as-applied challenges. Facial and as-applied challenges can be viewed as two separate inquiries. *See Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 482–86 (1989); *Taxpayers for Vincent*, 466 U.S. at 800 n.19 (stating that an overbroad regulation of speech may be facially invalid, even though its application in the instant case is constitutional).

If a statute is found facially unconstitutional on appeal, then the district court's determination that the statute was applied in a constitutional manner may remain undisturbed. *See City of Houston, Tex. v. Hill*, 482 U.S. 451, 457 (1987) (illustrating that although the Court of Appeals found a statute facially unconstitutional, the Supreme Court nevertheless left undisturbed the district court's ruling that the statute had not been applied in an unconstitutional manner). Indeed, standing for a First Amendment facial challenge does not depend on whether the complainant's own activity is shown to be constitutionally privileged. *See Bigelow v. Virginia*, 421 U.S. 809, 815–16 (1975); *see also Brockett*, 472 U.S. at 503 (collecting cases that hold "an individual whose own speech may validly be prohibited or sanctioned is permitted to challenge a statute on its face because it also threatens others not before the court"). Thus, we need not reverse the jury's verdict or the court's determination on partial summary judgment on the as-applied claims against the defendants simply because we find § 2-61 facially overbroad. Instead, we will review the merits of Acosta's remaining claims on appeal.

**B**

We review de novo the district court's decision to grant summary judgment. *Davis v. City of Las Vegas*, 478 F.3d 1048, 1053 (9th Cir. 2007). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Olsen v. Id. State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004).

On appeal, Acosta challenges the district court's grant of partial summary judgment in favor of the City on Acosta's as-applied state constitutional claim on grounds of public entity immunity, but Acosta does not challenge the grant of discretionary act immunity to the Mayor and the Chief of Police pursuant to California Government Code § 820.2.

California Government Code § 815 provides:

Except as otherwise provided by statute:

(a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.

(b) The liability of a public entity established by this part (commencing with Section 814) is subject to any immunity of the public entity provided by statute, including this part, and is subject to any defenses that would be available to the public entity if it were a private person.

To challenge the district court's determination, Acosta relies upon *Young v. County of Marin*, 241 Cal. Rptr. 169 (Ct. App. 1987) and the Committee Comment to § 815, both of which carve out an exception to § 815 for constitutionally created claims.

Under California's Tort Claims Act "public entities are immune where their employees are immune, except as otherwise provided by statute." *Caldwell v. Montoya*, 897 P.2d 1320, 1325 (Cal. 1995) (citations omitted). While Acosta is correct that *Young* notes the general exception that § 815 does not protect a public entity from liability for constitutionally created claims, he does not challenge the district court's determinations that (1) his as-applied state-law claim failed to state a claim because damages were not available to him, or (2) the Mayor and the Chief of Police are entitled to discretionary act immunity.[12] Instead he claims that the district court extended California case law too far in granting the City public entity immunity.

---

[12] Nor does Acosta argue that we should recognize a constitutional tort action for damages based upon a violation of article I, § 2 of the California Constitution. Without deciding the issue, we note that the companion cases of *Degrassi v. Cook*, 58 P.3d 360 (Cal. 2002), and *Katzberg v. Regents of University of California*, 58 P.3d 339, 350 (Cal. 2002), suggest that there is no basis to recognize a constitutional tort action for damages for a violation of article I, § 2. Indeed, much like the plaintiff in *Degrassi*, 58 P.3d at 366, alternative adequate remedies were readily available to Acosta under both the California Civil Procedure Code § 1085 and the Ralph Brown Act, Government Code § 54960. *See* Cal. Gov't Code § 54960 ("The district attorney or any interested person may commence an action by mandamus, injunction, or declaratory relief for the purpose of stopping or preventing violations or threatened violations of this chapter . . . .").

Without any basis for an underlying claim, it is unclear to us how Acosta's claim for relief supports an exception to the rule that a public entity will be immune where the employees are immune. Acosta makes general statements that *Young* controls and therefore his damages claim predicated upon his as-applied challenge under the California Constitution qualifies as a "constitutional violation" of the type excepted from § 815. In *Young*, however, the individual actors were not granted discretionary act immunity nor did the court address whether a constitutional tort action for damages should be recognized. Both of these unchallenged determinations fatally undermine Acosta's argument.

Because the Mayor and the Chief of Police are immune, California's general principle that a public entity is immune where its employees are immune controls. And as there are no independent grounds, either in the language or history of the section, to support implying a constitutional tort action, *Degrassi*, 58 P.3d at 366, Acosta's mere citation to the free speech clause does little to bolster his argument that the City was not entitled to public entity immunity. We affirm the district court's grant of summary judgment on claim two in favor of the City.

## IV

Acosta next argues that the district court erred in granting the individual police officers summary judgment on his First and Fourth Amendment claims. He argues that the officers were not entitled to qualified immunity for any of these claims. We review de novo a district court's decision to grant summary judgment on the basis of qualified immunity. *See Davis*, 478 F.3d at 1053.

## A

Again, our determination that § 2-61 is facially invalid does not impact our review of the district court's determination that the individual officers are entitled to qualified immunity. When a city council enacts an ordinance, officers are entitled to assume that the ordinance is a valid and constitutional exercise of authority. *See Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994). If an officer reasonably relies on the council's duly enacted ordinance, then that officer is entitled to qualified immunity. *Id.* at 1210.

In *Grossman*, a doctor protested the presence of a warship carrying nuclear weapons in the Portland harbor and was arrested pursuant to a city ordinance that prohibited organized demonstrations without receiving a permit from the city parks commissioner. *Id.* at 1202–03. The ordinance under which the doctor was arrested was found unconstitutional, but the court held that the officer was still entitled to qualified immunity, because the officer correctly believed that the city ordinance required a permit. *Id.* at 1210. Further, the court explained that it was objectively reasonable for the officer to rely on the constitutionality of the ordinance because it had been "duly promulgated" by the city council and it was not so obviously unconstitutional as to require a reasonable officer not to enforce it. *Id.*

In the present case, qualified immunity still protects the officers even though we find the statute upon which they relied facially unconstitutional. Like the statute in *Grossman*, § 2-61 was duly promulgated by the proper process and was recognized as a valid portion of the Costa Mesa Municipal Code. Just as the officer in *Grossman* reasonably believed

the statute constitutional, the officers here reasonably believed § 2-61 was constitutional.  During oral argument, strong arguments were presented for the constitutionality of this statute and it would not be fair to require the officers of Costa Mesa to be versed in the nuances of the canons of construction such that they would recognize this statute's potential constitutional invalidity.  Thus, it was objectively reasonable for the officers to believe the ordinance valid when they removed and later arrested Acosta for violating § 2-61.

**B**

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012).  Assessing whether an official is entitled to immunity is a two prong inquiry.  Under the first prong we ask whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Under the second prong we examine whether the right was clearly established. *Id.*  To be "clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal quotation marks omitted).  In other words, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). We may examine either prong first, considering the circumstances presented on appeal. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Acosta presents two arguments that the officers are not entitled to qualified immunity for seizing or arresting him: (1) he was arrested in retaliation for questioning the officers about why his time to speak was cut short and why he was asked to leave the council meeting; and (2) the officers lacked the requisite level of suspicion to seize or arrest him. Resolution of both contentions turns on whether probable cause existed to seize Acosta.

Assuming Acosta's contention accurately reflects why he was arrested, Acosta's claim still fails under prong two of *Saucier*.[13]  In *Reichle*, the Supreme Court held that it had never recognized, nor was there a clearly established First Amendment right to be free from a retaliatory arrest that is otherwise supported by probable cause. *Reichle*, 132 S. Ct. at 2097 ("[I]t was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.").  Furthermore, at the time of the Council meeting, our precedent had previously upheld restrictions on speech at city council meetings where the speech was actually disruptive and this remains the law. *See City of Norwalk*, 900 F.2d at 1425; *Kindt*, 67 F.3d at 270. Thus, if Acosta's seizure and arrest were supported by probable cause, the officers are entitled to qualified immunity.

All seizures, except a narrowly defined intrusion such as the one in *Terry v. Ohio*, 392 U.S. 1 (1968), are reasonable

---

[13] The arresting officers testified that Acosta was not under arrest when they asked him to exit the Council Chambers.  The decision to arrest him was not made until Acosta began physically resisting the officers after he was removed and was outside chambers.  Acosta offered no evidence to contest these assertions.

only if the seizure is supported by probable cause. *Dunaway v. New York*, 442 U.S. 200, 214 (1979). To determine whether there was probable cause, we look to "the totality of circumstances known to the arresting officers, [to determine if] a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986). While evidence supporting probable cause need not be admissible in court, it must be "legally sufficient and reliable." *Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir. 2002).

Violations of §§ 2-61 and 2-64 are misdemeanors and a person in violation of either ordinance can be arrested. Section 2-61(b)(5) requires every person addressing the Council to "comply with and obey the lawful orders or directions of the presiding officer." Here, the Mayor first indicated that he did not want Acosta to ask people to stand up in a show of support, but Acosta defiantly continued to encourage the audience to stand. Then the Mayor called for a recess to end his disruptive behavior. Acosta remained at the podium and continued to speak after the Mayor called the recess.

Given these undisputed facts, we find that probable cause existed to arrest Acosta for a violation of § 2-61 and summary judgment was properly granted in favor of the officers on this claim.[14] Thus, even assuming that Acosta was arrested in

---

[14] We note that if we were to find that no probable cause existed, the officers would still be entitled to qualified immunity. An officer is entitled to immunity where a reasonable officer would believe that probable cause existed, even if that determination was a mistake. *See Anderson*, 483 U.S. at 641; *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1983), *overruled on different grounds by Beck v. City of Upland*, 527 F.3d 853, 865 (9th Cir. 2008). Here, given the Mayor's repeated directives to

retaliation for his remarks, because probable cause existed for a violation of § 2-61, the officers are still entitled to qualified immunity, not only for the removal of Acosta from the chambers, but also for his subsequent arrest.  Summary judgment was properly granted in favor of the officers.  The remaining question we must answer is whether the officers employed excessive force when enacting the seizure and arrest.

## C

When effecting an arrest, the Fourth Amendment requires that officers use only such force as is "objectively reasonable" under the circumstances.  *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001).  To determine whether the force used was reasonable, we must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989) (internal quotation marks omitted).  Furthermore, the reasonableness must be judged from the perspective of a reasonable officer on the scene and allow for the fact that officers often have to make split-second decisions under evolving and uncertain circumstances. *Jackson*, 268 F.3d at 651.

We find that there was no excessive force here as a matter of law.  The undisputed evidence shows that the officers used only the force reasonably necessary to remove Acosta from

cease speaking, the fact that the council meeting was now in recess, and the undisputed fact that Acosta remained at the podium addressing both the audience and the council, a reasonable officer would have believed that probable cause existed to arrest Acosta for a violation of § 2-61.

the meeting and no reasonable jury could find excessive force as a matter of law based on that evidence. The video submitted by Acosta shows that he did not leave the podium when first asked to step down and the crowd began yelling both in support and opposition to Acosta. He also concedes that he did not leave the podium immediately. Considering the volatility of the situation and the presence of a large crowd of hostile demonstrators, the amount of force the officers used—grabbing Acosta's arms and placing him in an upper body control hold—was reasonable. Furthermore, when later placing Acosta under arrest, Acosta was kicking and flailing his body to actively resist the police. Holding him by his limbs to control him and prevent him from injuring an officer was also not unreasonable or excessive. Therefore, Acosta fails to meet prong one of *Saucier* and qualified immunity was properly granted to the officers on Acosta's excessive force claim.

## V

Acosta asserts that it was error for the district court to admit his December 2005 remarks before the City Council in which he called the Mayor a "fucking racist pig." The district court denied Acosta's motion in limine to exclude these remarks, concluding that they were relevant to the reasonableness of the Mayor's conduct at the January 2006 meeting in recalling how Acosta behaved when addressing the Council at its December meeting. Acosta argues the district court further erred by failing to give his suggested limiting instruction:

> Evidence of the plaintiff's speech or conduct at the December 6, 2005 meeting cannot be considered for the purpose of proving that he

is disruptive and that he acted in conformity
with that character on January 3, 2006.

The district court rejected this argument in its order denying Acosta's motion for a new trial on grounds that Acosta failed to raise an objection to the error pursuant to Federal Rule of Civil Procedure 51(c)(1).  The court had previously rejected the suggested limiting instruction finding the December statement "absolutely an act in conformity" and "highly relevant" to the January 3, 2006, meeting.

## A

We accord the district court "wide discretion in determining the admissibility of evidence under the Federal Rules."[15]  *United States v. Abel*, 469 U.S. 45, 54 (1984).  "Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ."  *Id.*  Furthermore, to reverse on the basis of an erroneous evidentiary ruling, we must conclude that the error was prejudicial.  *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008).

Assuming that Acosta's December 2006 remarks were admitted to show conformity with a disruptive character, Acosta has failed to show prejudice resulting from this

---

[15] The remaining three issues relate to Acosta's as-applied challenge that was before the jury.  For the reasons set forth in Part III A, our determination that § 2-61 is facially overbroad does not require reversal of the district court on any of these issues.

error.[16]  Three videos depicting *exactly* how Acosta acted at
the January 3, 2006, meeting were admitted into evidence.
Having the additional videos detracts from both the
significance of the December statements in comparison to the
January evidence before the jury and any potential prejudice
to the outcome of the trial.  Furthermore, the jury was
specifically instructed that conduct—and not words—could
be the only basis for finding whether Acosta "substantially
disrupted" the meeting.  Given the overwhelming evidence of
Acosta's actual disruptive behavior at the January meeting
and because the instructions as given included limitations on
how pure speech could not be used to support a finding that
Acosta was *actually* disruptive, there is no reason to believe
that the outcome of his trial was affected by the admission of
the evidence.  Thus, Acosta fails to show prejudice caused by
the admission of the statement and we affirm the district
court's denial of the motion for new trial.

**B**

We also review the district court's rejection of a proposed
jury instruction for an abuse of discretion.  *See Jones v.
Williams*, 297 F.3d 930, 934–35 (9th Cir. 2002); *Duran*,
221 F.3d at 1130–31.  Any error in instructing the jury in a

---

[16] It is questionable whether the evidence was in fact offered to prove a
character trait.  The district court initially admitted the evidence as
relevant to the Mayor's state of mind when exercising his discretion in
enforcing the City's ordinances and Acosta points to nowhere in the trial
record where the appellees actually argue that Acosta had a disruptive
character.  It ignores common experience to suggest the presiding officer
would not have been influenced by his knowledge of Acosta from the
December address.  Judges certainly experience this in the their
courtrooms when lawyers approach the podium who are known to the
court from prior appearances.

civil case does not require reversal if it is harmless.  *See Altera Corp. v. Clear Logic, Inc*., 424 F.3d 1079, 1087 (9th Cir. 2005).

Acosta argues the court erred by rejecting Acosta's instruction for the reason that the contested evidence was "absolutely an act in conformity, and it is highly relevant to Mr. Acosta's actions on January 3rd, 2006." *See* Fed. R. Evid. 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.").  If the district court's refusal to give the instruction was error, it was harmless because, as we have already noted, the district court provided an instruction that made the distinction between pure speech and speech that accompanies conduct. The instructions further specifically noted that Acosta's claims derived from the January 3, 2006, meeting. When the subsequent instructions refer to conduct, the reference was to Acosta's conduct at the January 3, 2006, meeting.

Considering the jury instructions as a whole, the jury was properly instructed to consider only Acosta's conduct at the January 3, 2006, meeting when deciding whether he caused an actual disturbance.  Thus, any error was harmless.  This conclusion is further bolstered by ample evidence in the record that supports the jury's finding that Acosta actually did disrupt the January 3, 2006, meeting by defying the Mayor's order that he cease speaking.

## VI

Next, Acosta argues that the district court erred in denying his renewed motion for judgment as a matter of law.

He argues that there was not substantial evidence to support the jury's verdict on his First Amendment claims. We review de novo the district court's grant or denial of a renewed motion for judgment as a matter of law. *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 999 (9th Cir. 2008). We ask whether the evidence, construed in the light most favorable to the nonmoving party permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. *See Martin v. Cal. Dep't of Veterans Affairs*, 560 F.3d 1042, 1046 (9th Cir. 2009). We must also draw all reasonable inferences in favor of the defendants, keeping in mind that "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted).

Here, the jury returned a verdict in favor of the defendants. The evidence presented at trial is easily interpreted to support a reasonable jury's determination that the Mayor neutrally and constitutionally applied the City's decorum rules to Acosta. Contrary to Acosta's assertion that the evidence shows the Mayor only feared a disruption and not that an actual disruption occurred, the properly instructed jury could certainly have found that the meeting was actually disrupted by Acosta addressing the audience and the audience's reaction to his urging them to stand. Indeed, the Mayor called an unplanned recess to diffuse the disruption. Acosta was not entitled to judgment as a matter of law and we affirm the district court's denial of his post-trial motion.

**VII**

Finally, Acosta appeals the district court's denial of his request for a declaration that the defendants failed to apply §§ 2-61 and 2-64 in a constitutional manner at the January 3, 2006, meeting. The district court's decision to deny equitable relief is reviewed for an abuse of discretion. *See Molski v. Foley Estates Vineyard & Winery, LLC*, 531 F.3d 1043, 1046 (9th Cir. 2008).

The Seventh Amendment provides that "no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. In our circuit, "it would be a violation of the Seventh Amendment right to jury trial for the court to disregard a jury's finding of fact." *Floyd v. Laws*, 929 F.2d 1390, 1397 (9th Cir. 1991). "Thus, in a case where legal claims are tried by a jury and equitable claims are tried by a judge, and the claims are 'based on the same facts,' in deciding the equitable claims 'the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations.'" *L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993) (quoting *Miller v. Fairchild Indus.*, 885 F.2d 498, 507 (9th Cir. 1989)).

Jury instructions numbers 14 and 15 specifically instructed the jurors to assess liability against the Mayor and the City upon finding that either or both deprived Acosta of his rights under the First Amendment. Instruction number 27 also stated that in enforcing §§ 2-61 and 2-64, the mayor could "bar a speaker from further audience . . . only if the speaker's activity itself — and *not the viewpoint* of the activity's expression — substantially impaired the conduct of the meeting." The jury rendered a verdict for the defendants.

As such, the jury necessarily found that Acosta caused an actual disturbance.  Considering this factual finding, it would be incongruous to declare that the defendants enforced the ordinances in an unconstitutional manner.  We affirm the district court's denial of equitable relief.

## VIII

Section 2-61 is facially overbroad and therefore invalid, and the offensive words cannot be excised from the ordinance.  As to Acosta's remaining claims, we find no reversible error.  The evidence amply supported the jury's verdict that Acosta caused an actual disruption of the City Council meeting.

**REVERSED in part and AFFIRMED in part.**  The parties will bear their own costs on appeal.